FILED

2011 Dec-21  PM 02:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | |
| | } | 2:11-cv-00280-WMA |
| AIRCRAFT (One (1) Douglas AD-4N Skyraider Aircraft, FAA Registration N-121CH, Serial Number 126956, together with its Log Books); AIRCRAFT CANNONS (Four (4) 20 MM M3); and AIRCRAFT PARTS (Assorted), | } } } } } } } } } | |
| | } | |
| Defendants, | } | |
| | } | |
| v. | } | |
| | } | |
| DIXIE EQUIPMENT, LLC, | } | |
| | } | |
| Claimant. | } | |

**MEMORANDUM OPINION**

Before the court is the motion of plaintiff, the United States of America ("United States"), for summary judgment pursuant to Rule 56, Fed. R. Civ. P. Doc. 22. The United States filed this civil action pursuant to the provisions of 19 U.S.C. § 1595a, alleging that the named in rem defendant properties, the Douglas AD-4N Skyraider Aircraft ("aircraft"), the four (4) 20 mm cannons ("cannons"), and the assorted aircraft parts ("aircraft parts") (collectively, the "defendant properties"), were each introduced into the United States contrary to law, and thus, are subject to forfeiture to the United States of America. Claimant, Dixie

Equipment, LLC ("Dixie Equipment"), has filed the only verified claim and answer in this action, thereby challenging the forfeiture.   For the reasons set forth below, the United States' motion for summary judgment will be granted.

## FACTS

By letter dated June 27, 2008, Claude Hendrickson, III ("Hendrickson"), the president and sole member of Dixie Equipment, requested authorization from the U.S. Department of State to import the defendant aircraft into the United States.   Before Hendrickson's request had been ruled on, on July 1, 2008, Dixie Equipment purchased the aircraft, together with the cannons and aircraft parts, from an individual in France, Jacques Bourret ("Bourret").[1]   On August 10, 2008, Hendrickson and Fred Cabanas ("Cabanas"), a ferry pilot hired by Dixie Equipment to fly the aircraft into the United States, traveled to France to pick up the aircraft.   Upon  arrival, Cabanas removed the cannons from the aircraft,[2] and Hendrickson made separate arrangements with Bourret

---

[1] In its response in opposition to the United States' motion for summary judgment, counsel for Dixie Equipment states, without citations to the record, that Hendrickson is an avid aircraft enthusiast who simply wanted to purchase, import, and restore an AD-4N Skyraider aircraft so that he could share it with the public and fly it in air shows.  The court notes that the record in this case does not contain Hendrickson's testimony, either through a deposition or even in the form of an affidavit or declaration.

[2] The parties dispute whether the cannons were live or inoperable at the time Cabanas removed them from the aircraft, but the dispute is not material to the resolution of this motion.

for the cannons to be shipped to a gun dealer in Washington State. Cabanas then left France and flew the aircraft to the United States, a trip that took several days, from August 13 to 21, 2008.

Meanwhile, on August 18, 2008, the Office of Regional Security and Arms Transfers, Bureau of Political-Military Affairs, U.S. Department of State, responded by letter to Hendrickson's request, denying authorization to import the aircraft based on foreign policy objections.

On August 21, 2008, Cabanas entered the United States with the aircraft through the port of Buffalo, New York. U.S. Customs and Border Protection Officer Timothy Tordy ("Agent Tordy") was on duty at the port that day. Cabanas presented Agent Tordy with the aircraft's certificate of registration, his medical authorization, and his pilot's license and passport. Cabanas told Agent Tordy that the aircraft was going to Alabama to fly in air shows and that the aircraft was owned as of that date by Bourret, which was the name still listed as the owner on the aircraft's registration. Agent Tordy has testified that Cabanas also told him that the aircraft would remain in the United States for only six to eight months and would be returning to France, but Cabanas denies telling Agent Tordy this. Agent Tordy permitted Cabanas's and the aircraft's entry into the United States,[3] and Cabanas then flew the

_____

[3]According to Agent Tordy, once pilots of war planes tell customs officials that they are entering the United States for air shows, customs officials have authority to allow them to pass

aircraft to an airport in Bessemer, Alabama, and delivered it to
Hendrickson the same day.

On September 8, 2008, Hendrickson submitted an application in
the name of Dixie Equipment to the Federal Aviation Administration
("FAA") for the purpose of changing the country of registration for
the aircraft from France to the United States.   The application
included the bill of sale showing that Hendrickson had purchased
the aircraft on July 1, 2008, from Bourret.   The FAA approved
Hendrickson's application on or about October 28, 2008, and as a
result, the aircraft registration number was changed from "F-AZDQ"
to "N-121CH."

On October 8, 2008, officers of U.S. Customs and Border
Protection in the port of Savannah, Georgia, conducted an
inspection of a shipment of merchandise from France held in two 40-
foot shipping containers.   The containers had been shipped to the
United States by Dixie Equipment, and the entry summary identified
the contents of the two containers as "AIR, HELICOPT PARTS: OTHER."
During the inspection, officers discovered the cannons in a wooden
box in the nose of one of the containers, located under the
assorted aircraft parts.   However, the cannons were not listed on
the entry summary, bill of lading, or other documentation submitted
by Dixie Equipment.   After an initial detention period, the

_____

into the United States.  Customs officials do not do anything to
confirm that these planes are actually flying in air shows.

officers seized the cannons and aircraft parts for violation of customs laws on October 15, 2008.[4]

This seizure prompted further investigation by federal law enforcement authorities which led to the discovery that the aircraft had previously entered the United States in August 2008 without the requisite license, permit, or other authorization from the United States government.  As a result, officers of U.S. Immigration and Customs Enforcement executed a federal seizure warrant at the Bessemer Air Center, Bessemer, Alabama, on April 24, 2009, constructively seizing the aircraft and its log books on that basis.

The United States filed a verified complaint for forfeiture in rem against defendants aircraft, cannons, and aircraft parts on January 27, 2011.  Dixie Equipment filed the only verified claim and answer.  The United States' motion for summary judgment followed, doc. 22, to which Dixie Equipment has responded, doc. 51.

## DISCUSSION

Title 19 of the United States Code, section 1595a, provides that property may be seized and forfeited when it has been introduced into the United States "contrary to law."  19 U.S.C. §

---

[4] After the cannons and aircraft parts were seized, Hendrickson sought a permit to import the cannons from the Firearms and Explosives Imports Branch of the Bureau of Alcohol, Tobacco, and Firearms ("ATF").  The ATF granted a conditional permit for the cannons' importation on March 31, 2009, apparently unaware that the cannons had already been seized by customs officials in October 2008.

1595a(a).  When the United States seeks forfeiture pursuant to the provisions of section 1595a, it may seize property upon a showing of probable cause to believe that the property is forfeitable.  *See* 19 U.S.C. § 1615; *United States v. One Beechcraft King Air 300 Aircraft*, 107 F.3d 829, 829 (11th Cir. 1997); *United States v. Parcel of Property,* 337 F.3d 225, 230 (2nd Cir. 2003).  Probable cause for forfeiture is tested by the same criteria as used to determine probable cause for the issuance of a search or seizure warrant.  *United States v. $242,484,00*, 389 F.3d 1149, 1178 n.1 (11th Cir. 2004) (en banc).  Once the United States has established probable cause, the claimant has the burden of persuasion to show by a preponderance of the evidence that the property is not in fact subject to forfeiture.  *Parcel of Property*, 337 F.3d at 230.

Thus, the United States bears the initial burden of showing that there is probable cause to believe that the aircraft, cannons, and aircraft parts were introduced into the United States contrary to law.  The United States' forfeiture complaint alleges three theories of forfeiture based on violations of customs laws: 1) that the aircraft, cannons, and aircraft parts are subject to forfeiture pursuant to 19 U.S.C. § 1595a(c)(2)(B) for licensing requirement violations; 2) that the aircraft and cannons are also subject to forfeiture pursuant to 19 U.S.C. § 1595a(c)(1)(A) because they were smuggled or clandestinely imported or introduced into the United States in violation of 18 U.S.C. §§ 542 and 545; and 3) that the

aircraft parts are also subject to forfeiture pursuant to 19 U.S.C. § 1595a(a) because they were used to facilitate the importation of merchandise contrary to law.

Although the United States asserts three bases on which the defendant properties are subject to forfeiture, its principal argument is that the defendant properties constitute merchandise whose importation or entry into the United States requires a license, permit, or other authorization of an agency of the United States government, and because they were not accompanied by such license, permit, or authorization at the time of importation or introduction into the United States, they constitute merchandise introduced or attempted to be introduced into the United States contrary to law and are subject to forfeiture under 19 U.S.C. § 1595a(c)(2)(B). Section 1595a(c)(2)(B) provides in pertinent part:

> (c) Merchandise introduced contrary to law.
>
> Merchandise which is introduced or attempted to be introduced into the United States contrary to law shall be treated as follows:
>
> . . . .
>
> (2) The merchandise may be seized and forfeited if—
>
> . . . .
>
> (B) its importation or entry requires a license, permit or other authorization of an agency of the United States Government and the merchandise is not accompanied by such license, permit, or authorization;

19 U.S.C. § 1595a(c)(2)(B).

The United States contends that the defendant properties constitute merchandise under this section because "merchandise" is defined in Title 19 as "goods, wares, and chattels of every description, and includes merchandise the importation of which is prohibited . . ." 19 U.S.C. § 1401(c). Further, the United States argues that the aircraft, cannons, and aircraft parts are items that require a license, permit, or authorization under section 1595a(c)(2)(B) because they constitute "defense articles" that require a government license prior to importation pursuant to the terms of the Arms Export Control Act, 22 U.S.C. § 2778. This act authorizes the President to control the importation of defense articles that are designated on the United States Munitions List, and it prohibits the importation of such items without a license.[5]

---

[5] The relevant provisions of the Arms Export Control Act are as follows:

Control of arms exports and imports.

(a) Presidential control of exports and imports of defense articles and services, guidance of policy, etc.; designation of United States Munitions List; issuance of export licenses; condition for export; negotiations information

(1) In furtherance of world peace and the security and foreign policy of the United States, **the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and**

The United States contends that all of the defendant properties are defense articles under the Arms Export Control Act because they are specifically included on the United States Munitions List, which can be found at 22 C.F.R. § 121.1.  This list expressly includes,

> **import of such articles and services.  The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.**
>
> * * *
>
> (b) Registration and licensing requirements for manufacturers, exporters, or importers of designated defense articles and defense services
>
> (2) Except as otherwise specifically provided in regulations issued under subsection (a)(1) of this section, **no defense articles or defense services designated by the President under subsection (a)(1) of this section may be exported or imported without a license for such export or import, issued in accordance with this chapter and regulations issued under this chapter,** except that no license shall be required for exports or imports made by or for an agency of the United States Government (A) for official use by a department or agency of the United States Government, or (B) for carrying out any foreign assistance or sales program authorized by law and subject to the control of the President by other means.

22 U.S.C. § 2778 (emphases added).

under the heading "GUNS AND ARMAMENT": "guns over caliber .50 (12.7 mm)", and under the heading "AIRCRAFT AND ASSOCIATED EQUIPMENT": "[a]ircraft . . . which are specifically designed, modified, or equipped for military purposes" as well as "[c]omponents, parts, accessories, attachments, and associated equipment . . . specifically designed or modified for the [aircraft]".[6]   Further,

---

[6] A more complete statement of the relevant provisions of the United States Munitions List is as follows:

General. The United States Munitions List.

(a) The following articles, services, and related technical data are designated as defense articles and defense services pursuant to sections 38 and 47(7) of the Arms Export Control Act (22 U.S.C. 2778 and 2794(7)) . . .

(b) Significant military equipment: An asterisk precedes certain defense articles in the following list. The asterisk means that the article is deemed to be "Significant Military Equipment" to the extent specified in § 120.7 of this subchapter. The asterisk is placed as a convenience to help identify such articles. . . .

. . . .

CATEGORY II—GUNS AND ARMAMENT
*(a) **Guns over caliber .50 (12.7mm),** whether towed, airborne, selfpropelled, or fixed, including but not limited to, howitzers, mortars, cannons and recoilless rifles.

. . . .

CATEGORY VIII—AIRCRAFT AND ASSOCIATED EQUIPMENT
*(a) **Aircraft,** including but not limited to helicopters, non-expansive balloons, drones, and lighter-than-air aircraft, **which are**

interpretive guidance for the United States Munitions List is provided generally at 22 C.F.R. § 121.2 *et seq.* This guidance clarifies, among other things, that even aircraft that have been

--------

**specifically designed, modified, or equipped for military purposes.** This includes but is not limited to the following military purposes: Gunnery, bombing, rocket or missile launching, electronic and other surveillance, reconnaissance, refueling, aerial mapping, military liaison, cargo carrying or dropping, personnel dropping, airborne warning and control, and military training. (See §121.3.)

\*(b) Military aircraft engines, except reciprocating engines, specifically designed or modified for the aircraft in paragraph (a) of this category .

. . .

(h) **Components, parts, accessories, attachments, and associated equipment (including ground support equipment) specifically designed or modified for the articles in paragraphs (a) through (d) of this category,** excluding aircraft tires and propellers used with reciprocating engines.

. . .

CATEGORY XXI—MISCELLANEOUS ARTICLES
(a) Any article not specifically enumerated in the other categories of the U.S. Munitions List which has substantial military applicability and which has been specifically designed, developed, configured, adapted, or modified for military purposes. The decision on whether any article may be included in this category shall be made by the Director, Office of Defense Trade Controls Policy.

22 C.F.R. § 121.1 (emphases added).

"demilitarized" are included on the United States Munitions List.[7]

---

[7] More specifically, 22 C.F.R. § 121.3 provides:

Aircraft and related articles.

**In Category VIII, *aircraft* means aircraft designed, modified, or equipped for a military purpose, including aircraft described as "demilitarized."** All aircraft bearing an original military designation are included in Category VIII. However, the following aircraft are not included so long as they have not been specifically equipped, reequipped, or modified for military operations:

(a) Cargo aircraft bearing "C" designations and numbered C-45 through C-118 inclusive, C-121 through C-125 inclusive, and C-131, using reciprocating engines only.

(b) Trainer aircraft bearing "T" designations and using reciprocating engines or turboprop engines with less than 600 horsepower (s.h.p.).

(c) Utility aircraft bearing "U" designations and using reciprocating engines only.

(d) All liaison aircraft bearing an "L" designation.

(e) All observation aircraft bearing "O" designations and using reciprocating engines.

22 C.F.R. § 121.3 (emphasis added). Additionally, 22 C.F.R. § 121.8 describes components, accessories, attachments, and other parts as listed on the United States Munitions List, as follows:

End-items, components, accessories, attachments, parts, firmware, software and systems.

(a) An *end-item* is an assembled article ready for its intended use. Only ammunition, fuel or another energy source is required to place it in an operating state.

The United States is correct in its position that under these regulations, each of the defendant properties constitutes an item designated as a defense article on the United States Munitions List because 1) the aircraft was originally designed and equipped for a military purpose, even if it was demilitarized for use in another country, 2) the cannons, which are 20 mm, constitute guns over .50 caliber (12.7 mm), and 3) the aircraft parts are components, parts, accessories, attachments, and associated equipment specifically designed or modified for the military aircraft.

Moreover, and as noted previously, the Arms Export Control Act prohibits the importation of defense articles without the requisite license, permit, or other authorization. *See* 22 U.S.C. §

---

(b) A *component* is an item which is useful only when used in conjunction with an end-item. A major component includes any assembled element which forms a portion of an end-item without which the end-item is inoperable. (Example: Airframes, tail sections, transmissions, tank treads, hulls, etc.) A minor component includes any assembled element of a major component.

(c) *Accessories* and *attachments* are associated equipment for any component, end-item or system, and which are not necessary for their operation, but which enhance their usefulness or effectiveness. (Examples: Military rifle scopes, special paints, etc.)

(d) A *part* is any single unassembled element of a major or a minor component, accessory, or attachment which is not normally subject to disassembly without the destruction or the impairment of design use. (Examples: Rivets, wire, bolts, etc.)

13

2778(b)(2).   Importantly, the federal regulations that accompany the Arms Export Control Act state that it is unlawful to import or attempt to import any defense article without **first** obtaining the required license or written approval from the Directorate of Defense Trade Controls.   *See* 22 C.F.R. § 127.1(a)(2)-(3).[8]   The United States has submitted  certificates from the U.S. Department of State and the U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives, reflecting that neither Dixie Equipment or Hendrickson received approval to import the aircraft, cannons, or aircraft parts **prior** to their introduction into the

---

[8] This section provides in part:

(a) It is unlawful:

. . . .

(2) To import or attempt to import any defense article whenever a license is required by this subchapter without **first** obtaining the required license or written approval from the Directorate of Defense Trade Controls;

(3) To conspire to export, import, reexport or cause to be exported, imported or reexported, any defense article or to furnish any defense service for which a license or written approval is required by this subchapter without **first** obtaining the required license or written approval from the Directorate of Defense Trade Controls;

22 C.F.R. § 127.1(a)(2)-(3) (emphases added).

14

United States.[9]

In sum, the United States reasons correctly that the aircraft, cannons, and aircraft parts are subject to import licensing requirements as "defense articles" under the Arms Export Control Act, 22 U.S.C. § 2778, and the implementing regulations, which prohibit the permanent importation of defense articles without first obtaining a license or permit. Accordingly, the United States has made a more-than-sufficient showing of probable cause for forfeiture of each of the defendant properties on the ground that each was introduced into the United States "contrary to law" because each was introduced into the United States without first obtaining the proper license or permit under 19 U.S.C. §

---

[9]It is true that Hendrickson submitted an "ATF Form 6" application to the U.S. Department of Justice Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") for permission to import the cannons into the United States, but he did not do so until five months **after** the cannons had already been seized at the port of Savannah in October 2008. In response to his application, the ATF granted a conditional permit to import the cannons, dated March 31, 2009, apparently unaware that they had already been introduced into the United States. The ATF has concurrent jurisdiction over the importation of guns on the U.S. Munitions List, and it has concurrent authority with the U.S. State Department's Directorate of Defense Trade Controls. *See* 27 C.F.R. § 447.1. ATF regulations require that the importation of all guns on the U.S. Munitions List be accompanied by a permit, which may be applied for by filing a Form 6-Part I. 27 C.F.R. §§ 447.41, 447.42. Under these regulations, Hendrickson could have sought a permit from the ATF to import the cannons, but he only attempted to do so five months after the cannons had been seized by customs officials. As such, he did not comply with the regulations accompanying the Arms Export Control Act that require an individual to obtain the proper license **prior to** importing the defense article. *See* 22 C.F.R. § 127.1(a)(2).

1595a(c)(2)(B).

The burden then shifts to Dixie Equipment to establish by a preponderance of the evidence that the defendant properties are not, in fact, forfeitable under section 1595a(c)(2)(B). However, with regard to the defendant aircraft and cannons, Dixie Equipment does not offer any defense whatsoever to the United States' argument that it did not obtain the required licenses prior to introducing these properties into the United States.[10] As such, the

---

[10] If Dixie Equipment had a defense to the licensing violation claims, presumably Hendrickson would have submitted an affidavit or declaration on the issue. In any event, courts have uniformly held that there is no "innocent owner" defense to forfeiture claims brought pursuant to 19 U.S.C. § 1595a. Indeed, section 1595a does not contain an innocent owner provision. Instead, section 1595a(c) provides that certain items "shall" or "may" be forfeited, and the state of mind of the owner is not mentioned. Additionally, although Congress enacted an innocent owner defense to forfeiture actions in the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), *see* 18 U.S.C. § 983(d), CAFRA specifically excludes "provisions of law codified in title 19" from its applicability (commonly referred to as the "customs carve out"), *see* 18 U.S.C. § 983(i)(2)(A). As such, forfeiture actions brought pursuant to section 1595a are not subject to CAFRA's innocent owner provision. *See United States v. Davis*, 648 F.3d 84, 95 (2nd Cir. 2011) ("The statutory language is unambiguous: 19 U.S.C. § 1595a(c) does not contain an innocent owner defense, and the customs carve-out excludes the government's customs claim from the scope of 18 U.S.C. § 983(d). We therefore hold that no innocent-owner defense applies to forfeiture claims brought pursuant to 19 U.S.C. § 1595a."); *United States v. Approximately 1,170 Carats of Rough Diamonds*, 2008 WL 2884387, at *9 (E.D.N.Y. July 23, 2008) ("There is no language in . . . § 1595a(c) that provides for a good faith defense to forfeiture."); *United States v. One Lucite Ball Containing Lunar Material*, 252 F. Supp. 2d 1367, 1378 (S.D. Fla. 2003)(innocent-owner defense in section 983(d) does not apply to forfeiture under 19 U.S.C. § 1595a); *United States v. An Antique Platter of Gold*, 991 F. Supp. 222, 232 (S.D.N.Y. 1997)("Section 1595a(c) does not provide for an innocent owner defense."), *aff'd*

United States' motion for summary judgment is due to be granted as to its claim that the defendant aircraft and cannons are forfeitable under section 1595a(c)(2)(B).

Dixie Equipment does argue that "some" of the aircraft parts do not require permits or licensing by the U.S. Department of State or the ATF before importation because they are not covered by the U.S. Munitions List.  Dixie Equipment states that the United States' assertion that all of the aircraft parts constitute "components, parts, accessories, attachments, and associated equipment . . . specifically designed or modified for" the aircraft is not supported by any evidence, and that instead, many of the aircraft parts were designed for civilian aircraft and have not been modified to fit the defendant aircraft.  But Dixie Equipment similarly has not offered any evidence in support of its conclusion that "some" of the defendant aircraft parts were not designed or modified for the aircraft at issue in this case.  The only documents in this record that actually describe the nature of the aircraft parts are the entry documents that were submitted with the parts when they were introduced into the United States through the port of Savannah, Georgia.  The entry summary describes the contents of the shipping container as: "AIR, HELICOPT PARTS: OTHER."  The accompanying invoice states:

_____

184 F.3d 131 (2nd Cir. 1999).

17

> I, the undersigned, Jacques Bourret, certifies
> having given to Dixie Equipment, a lot [sic]
> spare parts for a Douglas AD4.  This plane has
> been inspected by an expert from the Ministry
> of Defense and is not considered military
> equipment . . . These parts have been stored
> for over thirty years and no guarantee
> expressed or implied is given.  These parts
> are for civilian use for the maintenance of a
> Douglas AD4 plane.

This invoice specifically describes the parts as being for use in relation to the defendant aircraft.  Thus, they constitute "components, parts, accessories, attachments, and associated equipment . . . specifically designed or modified for" the aircraft pursuant to the U.S. Munitions List, 22 C.F.R. § 121.1.  As previously noted, the fact that the defendant aircraft may be considered to have been demilitarized for civilian use does not remove it from inclusion on the U.S. Munitions List.  As such, the fact that Bourret described the aircraft parts as for "civilian use" is not sufficient to show that the aircraft parts are not included on the U.S. Munitions List, and by extension, are not forfeitable for the reasons set forth in section 1595a(c)(2)(B). Dixie Equipment has not met its burden of showing by a preponderance of the evidence that the aircraft parts are not, in fact, forfeitable, and as such, the United States' motion for summary judgment is also due to be granted insofar as it pertains to its claim that the assorted aircraft parts are forfeitable under section 1595a(c)(2)(B).

18

As an alternative to its primary argument regarding licensing violations, the United States argues that the defendant aircraft and cannons are also subject to forfeiture under 19 U.S.C. § 1595a(c)(1)(A)[11] because they constitute merchandise introduced or attempted to be introduced into the United States contrary to law on the basis that they were smuggled, or clandestinely imported or introduced in violation of 18 U.S.C. §§ 542 and 545, which prohibit the entry of merchandise into the United States by means of false statements[12] and the knowing and willful smuggling of merchandise

---

[11] Section 1595a(c)(1)(A) provides:

> (c) Merchandise introduced contrary to law.

> Merchandise which is introduced or attempted to be introduced into the United States contrary to law shall be treated as follows:

> (1) The merchandise shall be seized and forfeited if it – (A) is stolen, smuggled, or clandestinely imported or introduced;

19 U.S.C. § 1595a(c)(1)(A).

[12] 18 U.S.C. § 542 provides:

> Whoever enters or introduces, or attempts to enter or introduce, into the commerce of the United States any imported merchandise by means of any fraudulent or false invoice, declaration, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false practice or appliance, or makes any false statement in any declaration without reasonable cause to believe the truth of such statement, or procures the making of any false statement as to any matter material thereto without

into the United States,[13] respectively.   Additionally, the United

States contends that the defendant assorted aircraft parts are

subject to forfeiture as facilitating the introduction of

merchandise contrary to law under 19 U.S.C. § 1595a(a).[14]

_____

> reasonable cause to believe the truth of such
> statement, whether or not the United States
> shall or may be deprived of any lawful
> duties...
>
> Shall be fined for each offense under this
> title or imprisoned not more than two years.

[13] 18 U.S.C. § 545 provides:

> Whoever knowingly and willfully, with intent
> to defraud the United States, smuggles, or
> clandestinely introduces or attempts to
> smuggle or clandestinely introduce into the
> United States any merchandise which should
> have been invoiced, or makes out or passes, or
> attempts to pass, through the customhouse any
> false, forged, or fraudulent invoice, or other
> document or paper; or Whoever fraudulently or
> knowingly imports or brings into the United
> States, any merchandise contrary to law, or
> receives, conceals, buys, sells, or in any
> manner facilitates the transportation,
> concealment, or sale of such merchandise after
> importation, knowing the same to have been
> imported or brought into the United States
> contrary to law-
>
> Shall be fined under this title or imprisoned
> not more than 20 years, or both.

[14] Section 1595a(a) provides:

> Except as specified in subsection (b) or (c)
> of section 594 of this Act [19 U.S.C. §
> 1594(b) or (c), relating to common carriers],
> every vessel, vehicle, animal, aircraft, or
> other thing used in, to aid in, or to
> facilitate, by obtaining information or any

The legal duties imposed upon persons bringing merchandise
into the United States are described in 19 U.S.C. § 1484,[15] and

other way, the importation, bringing in,
unlading, landing, removal, concealing,
harboring, or subsequent transportation of
any article which is being or has been
introduced, or attempted to be introduced,
into the United States contrary to law,
whether upon such vessel, vehicle, animal,
aircraft, or other thing or otherwise, may be
seized and forfeited together with its
tackle, apparel, furniture, harness, or
equipment.

[15] Section 1484 provides in relevant part:

Entry of Merchandise

(a) Requirement and Time.

(1) . . . [I]mporter of record, either in
person or by an agent authorized by the party
in writing, shall, using reasonable care –

(A) make entry therefor by filing with the
Bureau of Customs and Border Protection such
documentation or . . . such information as is
necessary to enable the Bureau of Customs and
Border Protection to determine whether the
merchandise may be released from custody of
the Bureau of Customs and Border Protection;

(B) complete the entry . . . by filing with
the Bureau of Customs and Border Protection
the declared value, classification and rate of
duty applicable to the merchandise, and such
other documentation or . . . information as is
necessary to enable the Bureau of Customs and
Border Protection to–

(i) properly assess duties on the merchandise,

(ii) collect accurate statistics with respect
to the merchandise, and

include providing documentation and invoices describing aspects of the merchandise for review by customs officials.  Further, with respect to invoices, 19 U.S.C. § 1481 provides that "[a]ll invoices of merchandise to be imported into the United States . . . shall set forth, in written, electronic, or such other form as the Secretary shall prescribe, the following: . . . . (3) A detailed description of the merchandise, including the commercial name by which each item is known."  The United States contends that Dixie Equipment violated these statutes with respect to the cannons because the cannons should have been listed on the entry summary, invoice, and bill of lading submitted to customs officials in connection with their shipment from France to the port of Savannah, but instead, they were not mentioned on any documentation, and they were in their own box underneath the assorted aircraft parts.  The

--------

(iii) determine whether any other applicable requirement of law (other than a requirement relating to release from customs custody) is met.

. . . .

(d) Signing and contents.

(1) Entries shall be signed by the importer of record, or his agent, unless filed pursuant to an electronic data interchange system. . . . The entry shall set forth such facts in regard to the importation as the Secretary may require and shall be accompanied by such invoices, bills of lading, certificates, and documents, or their electronically submitted equivalents, as are required by regulation.

United States also contends that these statutes were violated with respect to the aircraft because Cabanas made false statements to Agent Tordy in an effort to introduce the aircraft into the United States, stating that Bourret owned the aircraft and that it would only be in the United States temporarily and would be returning to France.

Finally, the United States contends that under 19 U.S.C. § 1595a(a), even properly-invoiced merchandise is subject to forfeiture if it is used to facilitate the illegal importation of other merchandise, and that here, the properly-invoiced aircraft parts were used as a "cover" to facilitate the unlawful importation of the cannons by making their detection more difficult.

Dixie Equipment devotes the vast majority of its response brief to asserting its defenses to these alternative theories of forfeiture, i.e., that it smuggled the aircraft and cannons into the United States or made false statements to introduce them, and that it used the aircraft parts to facilitate the unlawful introduction of the cannons.  As to the aircraft, Dixie Equipment claims that it was not introduced into the United States "contrary to law" because Agent Tordy authorized Cabanas to enter the United States with the aircraft, and Cabanas did not knowingly provide him with any false document or statement to induce Agent Tordy to do so.  Dixie Equipment states that Cabanas merely named Bourret as the owner of the aircraft because Bourret was still listed on the

aircraft's registration as the owner, and Cabanas did not know that
he had sold the aircraft to Hendrickson.    Additionally, Dixie
Equipment argues that facts are in dispute as to whether Cabanas
told Agent Tordy that the aircraft would only be in the United
States temporarily and would be returning to France, such to
preclude summary judgment on the United States' false statement
theory.    As to the cannons, Dixie Equipment argues that it never
intended to import the cannons into the United States through the
port of Savannah, but rather, that Hendrickson made arrangements to
import the cannons legally through a gun broker in Washington
State.    In other words, Dixie Equipment's position is that the
cannons were imported in the same container as the aircraft parts
through an error, and not a knowing act.    Finally, Dixie Equipment
argues that the aircraft parts could not have been used to
facilitate the importation of the cannons contrary to law because
the cannons were not introduced into the United States contrary to
law.

The court notes that 18 U.S.C. §§ 542 and 545, the statutes on
which the United States relies for its alternative forfeiture
theory pursuant to section 1595a(c)(1)(a), appear to require that
the individual alleged to have introduced merchandise into the
United States in violation of the statutes possess a particular
state of mind or level of intent.    *See* § 542 (prohibiting the
introduction of merchandise by means of false statements "without

reasonable cause to believe the truth of the statement") and § 545 ("Whoever knowingly and willfully, with intent to defraud the United States, smuggles . . ."). Based on this, Dixie Equipment argues that material facts are in dispute as to whether it acted with the requisite intent, such to preclude summary judgment on the United States' alternative theories of forfeiture under sections 1595a(c)(1)(a) and 1595a(a). However, the many cases holding that there is no innocent owner defense to forfeiture actions brought pursuant to section 1595a(c) suggest that the state of mind of the alleged smuggler is irrelevant.

Ultimately, the court need not reach the merits of these additional and alternative theories of forfeiture because the court has already concluded that each of the defendant properties is forfeitable to the United States pursuant to 1595a(c)(2)(B). In short, any lingering fact questions concerning whether Dixie Equipment smuggled or made false statements with regard to the defendant properties does not change the undisputed fact that Dixie Equipment did not obtain the proper permits and/or licenses to import the defendant properties **prior** to their introduction into the United States, facts to which Dixie Equipment has offered no viable defense, and to which courts have held that there exists no "innocent owner" defense in any event.

## CONCLUSION

For the foregoing reasons, the United States' motion for

25

summary judgment will be granted.  A separate order of forfeiture
of the defendant properties will be entered.

DONE this 21st day of December, 2011.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE